IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


TAMMY R.  COFFMAN,                    )
                                     )
v.                                   )        NO.  2:10-0115
                                     )
CAROLYN W.  COLVIN,                  )
        Acting Commissioner of       )
        Social Security[1]           )


To: The Honorable John T.  Nixon, Senior District Judge


## REPORT AND RECOMMENDATION


The plaintiff filed this action pursuant to 42 U.S.C.  § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as

provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C.  § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No.  15) should be DENIED.

---

[1] Carolyn W.  Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W.  Colvin is
substituted for former Commissioner Michael J.  Astrue as the defendant in this suit.

# I. INTRODUCTION

On May 17, 2004, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of October 1, 2000. (Tr. 86, 768.) She subsequently amended her alleged onset date to May 18, 2001. (Tr. 216.) The plaintiff alleged disability due to back and neck injuries, pain resulting from spinal surgery, migraine headaches, and bipolar disorder. (Tr. 33, 184, 456-59.) Her applications were denied initially and upon reconsideration. (Tr. 28-33, 67-70, 73-76.) The plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") K. Dickson Grissom on November 8, 2007. (Tr. 921-36.) On January 25, 2008, the ALJ entered an unfavorable decision. (Tr. 768-76.) The plaintiff filed a request for review of the hearing decision, and on August 19, 2008, the Appeals Council remanded the case[2]. (Tr. 762-64.) On remand, the ALJ held a hearing on January 27, 2009 (tr. 937-58), and issued an unfavorable decision on July 17, 2009. (Tr. 16-27.)

On October 20, 2010, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.)

---

[2] In its order of remand, the Appeals Council instructed the ALJ to obtain additional evidence concerning the plaintiff's mental impairment, evaluate the plaintiff's mental impairment in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a, give further consideration to the plaintiff's maximum residual functional capacity ("RFC"), and obtain supplemental evidence from a vocational expert ("VE") to clarify the effect of the assessed limitations on the plaintiff's occupational base if warranted. (Tr. 16, 762-63.)

## II. BACKGROUND

The plaintiff was born on February 19, 1970, and she was thirty-one years old as of May 18, 2001, her amended alleged onset date. (Tr. 86.) She has an eighth grade education and has previously worked as a sewing machine operator, assembly worker, and garment inspector. (Tr. 25, 92, 926-27, 942-43.) The plaintiff has not worked since 1999. (Tr. 818, 927.)

### A. Chronological Background: Procedural Developments and Medical Records

1. Physical Impairments

In April 2001, the plaintiff was in an automobile accident after which she suffered neck pain. (Tr. 685.) A cervical MRI taken in May 2001 showed a "[s]mall herniated disc at C5-6 posteriorly and to the right" but was "otherwise unremarkable." (Tr. 708.) On June 8, 2001, neurosurgeon Dr. Joseph Jestus performed a right C5-6 hemilaminectomy,[3] partial medial facetectomy,[4] and diskectomy[5]. (Tr. 713-14.) Approximately three months after the original surgery the plaintiff complained of neck pain and numbness in her right arm. (Tr. 681.) Dr. Jestus prescribed Naproxen for pain, and, when the plaintiff asked him for something stronger, he also prescribed Vicodin. *Id*. A cervical MRI on October 4, 2001, revealed marginal osteophyte formation, narrowing of the nerve

---

[3] A hemilaminectomy is the "surgical removal of one side of the vertebral lamina." Dorland's Illustrated Medical Dictionary 829 (2003) ("Dorland's").

[4] A facetectomy is the "excision of the articular facet of a vertebra." Dorland's at 663.

[5] A diskectomy is the "excision of an intervertebral disk." Dorland's at 545.

sleeve, and disc herniation[6]. (Tr. 707.) On October 19, 2001, Dr. Jestus performed a second surgery that involved an anterior cervical diskectomy and fusion at C5-6. (Tr. 711-12.) At a checkup on November 14, 2001, the plaintiff's preoperative arm pain was gone, and the C5-6 fusion appeared satisfactory. (Tr. 679.) The plaintiff continued to experience neck pain, however. (Tr. 670-73, 675-77.) In May 2003, Dr. Jestus noted that the vertebra in the plaintiff's neck had "gone on to a fibrous union, not a bony union." (Tr. 669.) On July 14, 2003, Dr. Jestus performed a third surgery on the plaintiff to "redo" foraminotomy[7] on the right C5-6 posterior cervical fusion. (Tr. 709-10.)

After this surgery, the plaintiff regularly presented to Dr. Kenneth Beaty for treatment of neck pain, back pain, and migraine headaches. (Tr. 639-54.) Dr. Beaty prescribed Hydrocodone[8] to the plaintiff through June 1, 2004, at which time he discharged her from his care "due to her drug seeking behavior." (Tr. 638.) Dr. Beaty made this decision upon learning that the plaintiff was receiving prescriptions from more than one doctor. *Id.*

After she was discharged from Dr. Beaty's care, the plaintiff began seeing nurse practitioner Michael Boles monthly from June 2004 through January 2009. (Tr. 228-67, 477-509, 570-97, 852-59, 895-914.) During this time the plaintiff frequently presented with neck, back, shoulder, arm, knee, and hand pain along with migraine headaches and muscle spasms. (Tr. 229, 231, 239, 245,

---

[6] Disc herniation is the protrusion of an intervertebral disc, which may impinge on nerve roots. Dorland's at 844.

[7] A foraminotomy is an operation used to relieve pressure on nerves being compressed by the intervertebral foramina. Dorland's at 724.

[8] Hydrocodone is a narcotic antitussive. Saunders Pharmaceutical Word Book 352 (2009) ("Saunders").

259, 267, 505, 583, 587, 590, 595, 859, 910, 912, 914.) Mr. Boles prescribed, *inter alia*, Hydrocodone, Darvocet, Flexeril, Bupap, Vicoprofen, Celebrex, Ezol, and Robaxin[9]. (Tr. 227-67, 477-509, 570-597, 857-868, 894-914.) In February 2007, the plaintiff stated that her pain was a 5 on a 10 point scale while using medications. (Tr. 240.) In March 2008, Mr. Boles assessed the plaintiff as presenting "multiple myalgias, multiple joint pain, chronic pain syndrome, and right knee, neck, and arm pain." (Tr. 908.)

On September 1, 2004, Tennessee Disability Determination Services ("DDS") consultative physician Dr. Jerry Lee Surber physically examined the plaintiff. (Tr. 631-34.) Dr. Surber noted palpable tenderness of the cervical musculature and some muscle spasm as well as diminished range of motion of the cervical spine. (Tr. 632.) He also noted that the plaintiff had no limitation of motion of her dorsolumbar spine or bilateral shoulders and had equal and full bilateral grip strength as well as full muscle strength in both upper and lower limbs. *Id*. Dr. Surber observed some symptom magnification during the examination. (Tr. 633.) For example, the plaintiff walked with a noticeable limp to the left while he examined her gait; however, when she exited the examination room, the plaintiff had no observable limp. *Id*.

On June 28, 2005, DDS consultative physician Dr. Denise Bell completed a physical RFC assessment. (Tr. 525-32.) Dr. Bell opined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds; stand or walk for about six hours in an eight hour work day; sit for about six hours in an eight hour work day; and push and/or pull without

---

[9] Darvocet is a narcotic analgesic; Flexeril is a skeletal muscle relaxant; Bupap is a barbiturate sedative, analgesic; Vicoprofen is a narcotic analgesic and antitussive; Celebrex is a nonsteroidal anti-inflammatory used to treat arthritis; Ezol is used to treat headaches; and Robaxin is a skeletal muscle relaxant. Saunders at 115, 141, 202, 294, 619, 753.

limitations. (Tr. 526.) Dr. Bell also reported that the plaintiff would have limitations reaching overhead frequently. (Tr. 528.)

On August 29, 2005, the plaintiff had right carpal tunnel release surgery performed by Dr. Damon Petty. (Tr. 473.) During a followup visit on September 13, 2005, Dr. Petty noted that the plaintiff "continues to complain in an exaggerated fashion of pain, aching, and throbbing under the arm, etc. This is an inappropriate level status post carpal tunnel release." (Tr. 471.) The plaintiff requested a narcotics prescription, but Dr. Petty declined and instead recommended that she continue occupational therapy. *Id.*

In 2007, the plaintiff had two knee surgeries. (Tr. 203-06.) On June 21, 2007, Dr. Charles Kaelin repaired an anterior meniscus tear and shaved the chondromalacia to help relieve the plaintiff's joint pain. (Tr. 201-02, 205-06.) On August 28, 2007, Dr. Kaelin reported that the plaintiff had less knee pain following surgery but still had some swelling and discomfort. (Tr. 197.) Accordingly, he drew fluid off the knee and injected Depo-Medrol and Marcaine[10]. *Id.* On October 3, 2007, the plaintiff presented to Dr. Kaelin with a painful pop in her knee. (Tr. 196.) X-rays showed a patellar fracture (tr. 208), and on October 30, 2007, Dr. Kaelin performed an arthroscopy on the plaintiff's right knee. (Tr. 203-04.) From November 6, 2007, through January 24, 2008, the plaintiff attended physical therapy at Tennessee Sports Medicine and Orthopaedics on referral from Dr. Kaelin. (Tr. 830-834.) On January 24, 2008, Dr. Kaelin was informed that the plaintiff had not been showing up to her physical therapy appointments, and the physical therapist suggested that the plaintiff begin a home exercise program. (Tr. 830.)

---

[10] Depo-Medrol is an anti-inflamatory, and Marcaine is a local anesthetic. Saunders at 210, 426.

## 2. Psychological Impairments

The plaintiff has a history of depression, anxiety, and bipolar disorder. On June 23, 2000, the plaintiff sought treatment at Plateau Mental Health Center ("PMHC"), presenting with anxiety, mild depressed mood, crying spells, nervousness, difficulty eating and sleeping, and relationship troubles. (Tr. 272.) The plaintiff reported a history of physical and sexual abuse. (Tr. 272, 278-80.) She also relayed that her current primary care physician had refused to provide her with Xanax, and she had been similarly unable to obtain Xanax from another physician she visited. (Tr. 272.) During this visit, the plaintiff's Global Assessment of Functioning ("GAF") score was 50[11]. (Tr. 273.) The clinician further observed that, while the plaintiff perceived her problems as severe, the clinician perceived them as moderate. *Id.*

On July 24, 2000, the plaintiff returned to PMHC and demanded to be given a prescription prior to being seen for her appointment. (Tr. 278.) Subsequently, she consented to an examination during which she exhibited circumstantial thinking, racing thoughts, "intrusive thoughts and memories," and paranoia. (Tr. 279.) The plaintiff was diagnosed with post-traumatic stress disorder ("PTSD"), mood disorder not otherwise specified ("NOS"), panic disorder with agoraphobia, social phobia, and dependant personality disorder. *Id.* Her GAF score at the time was 40[12]. *Id.* Nurse

---

[11] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 41 and 50 falls within the range of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[12] A GAF score between 31 and 40 falls within the range of "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

practitioner Kathleen McCoy, the examining clinician, prescribed Zyprexa, Depakote, and Hydroxyzine but declined to prescribe Xanax or Klonopin[13]. (Tr. 278-80.) The plaintiff did not believe that the medications were effective and did not return to Ms. McCoy. (Tr. 748.) In March 2001, plaintiff returned to PMHC and was diagnosed with depressive disorder and anxiety disorder NOS. (Tr. 756-60.) Her GAF score at that time had improved to 55.[14] (Tr. 759.)

In August 2002, the plaintiff was referred to PMHC by her obstetrician. (Tr. 751.) The plaintiff reported feeling depressed every day and having difficulty controlling her anger, trouble sleeping, poor memory, and restlessness. (Tr. 751-55.) On September 6, 2002, nurse practitioner Nile Remsing performed a psychiatric evaluation and diagnosed the plaintiff with "major depressive disorder, recurrent, moderate"; bipolar disorder NOS; and borderline personality disorder. (Tr. 748-50.) The plaintiff's GAF score was 50. *Id*. Ms. Remsing prescribed Zyprexa but refused to prescribe Xanax while the plaintiff was pregnant. (Tr. 749.) Dr. Jestus had similarly warned the plaintiff that she should wean herself off of pain medication during pregnancy. (Tr. 673.)

During an examination by Ms. Remsing, on January 23, 2003, the plaintiff presented as depressed, tearful, very angry, and emotionally unstable, and she stated that "I want my Xanax." (Tr. 735.) Ms. Remsing, diagnosed the plaintiff with bipolar disorder NOS and borderline

---

[13] Zyprexa and Depakote are both used to treat manic episodes of bipolar disorder, and Hydroxyzine is a minor tranquilizer and antihistamine. Saunders at 210, 357, 782.

[14] A GAF score of 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

personality disorder. *Id*. The plaintiff relayed that Zyprexa was not working, and Ms. Remsing prescribed Remeron and Xanax[15]. (Tr. 736.)

In March 2003, the plaintiff reported improvement in her symptoms and reported that she continued to take Remeron and Xanax. (Tr. 733-34.) Ms. Remsing, however, noted her doubts that the plaintiff was taking Remeron because the plaintiff had no comment on its taste and did not report a significant improvement in sleep. (Tr. 734.) In January 2004, Lamictal[16] was added to the plaintiff's medications to help address her mood swings and insomnia. (Tr. 726.) She was denied a prescription for "more Xanax" on January 15, 2004. *Id*. By October 6, 2004, the plaintiff's GAF score had improved to 55. (Tr. 313.)

On October 5, 2005, DDS consultative psychologist Dr. Linda Blazina performed a consultative psychological evaluation. (Tr. 551-55.) Dr. Blazina noted that the plaintiff was "alert and passively cooperative, but quite irritable." (Tr. 552.) The plaintiff reported having problems with her appetite, sleep, and concentration, and she stated that she had "no interest in doing anything." *Id*. She denied suicidal ideation or intent, but reported that she had a history of cutting her wrists and face. *Id*. The plaintiff relayed that she had episodes "nearly every day where I yell, scream and holler and I've been that way nearly all my life." *Id*. During the mental status evaluation, the plaintiff had difficulty with her attention and concentration skills and lost her train of thought several times, but was able to complete six iterations of serial seven subtractions. *Id*. Dr. Blazina noted that the plaintiff's intellectual functioning was in the low average range and that her impulse

---

[15] Remeron is an antidepressant, and Xanax is a sedative used to treat panic disorders and agoraphobia. Saunders at 608, 768.

[16] Lamictal is used to treat bipolar disorder. Saunders at 396.

control and stress tolerance appeared to be poor. (Tr. 554.) Dr. Blazina opined that the plaintiff's

current GAF was 60-65, which indicated mild symptoms, and diagnosed the plaintiff with depressive

disorder NOS and borderline personality disorder. (Tr. 555.) Describing the plaintiff's mental

ability to do work related activities, Dr. Blazina opined:

> Ms. Coffman's ability to understand and remember does not appear significantly
> limited at the present time. Her ability to sustain her concentration and persistence
> appears to be mildly to moderately limited at this time due to her psychological
> condition, as well as chronic pain issues. Her social interaction abilities are felt to
> be moderately to severely impaired due to her characterological issues, as well as
> depression and chronic pain issues. Her ability to adapt to changes in a work routine
> and tolerate work place stress is felt to be moderately limited due to her
> psychological condition.

*Id.*

On October 15, 2005, Dr. Rebecca Hansmann assessed the plaintiff's mental RFC. (Tr. 547-

49.) Dr. Hansmann found that the plaintiff was not significantly limited except for moderate

limitations in the following areas: (1) interacting appropriately with the general public; (2) accepting

instructions and responding appropriately to criticisms from supervisors; (3) getting along with

coworkers or peers without distracting them or exhibiting behavioral extremes; and (4) responding

appropriately to changes in the work setting. (Tr. 548.) Dr. Hansmann clarified that the plaintiff

"will have some difficulty interacting effectively with the public, co-workers, and supervisors, but

can do so" and that the plaintiff "can adapt to infrequent change." (Tr. 549.) Dr. Hansmann also

completed a Psychiatric Review Technique ("PRT") on October 15, 2005, in which she assessed the

plaintiff with depressive disorder NOS and borderline personality disorder. (Tr. 533-46.)

Dr. Hansmann determined that the plaintiff had mild limitations in activities of daily living and

maintaining concentration, persistence, or pace and moderate limitations maintaining social functioning. (Tr. 543.)

Nurse practitioner Holly Robertson treated the plaintiff at PMHC from January 27, 2006, to October 7, 2008, during which time the plaintiff's GAF score remained stable at 55. (Tr. 318-29, 882-93.) The plaintiff reported on February 24, 2006, that her medications were "definetely [*sic*] helping," that her panic attacks seemed to be situational, and that she could sometimes control her tendency to act out in anger by removing herself from a situation. (Tr. 321.) During her treatment with Ms. Robertson, the plaintiff generally remained goal-directed, continued taking her medications, and experienced modest improvements. (Tr. 882-93.) During this time Ms. Robertson reported that the plaintiff was taking Lamictal, Risperdal, Remeron, and Xanax. (Tr. 882, 885, 888, 890, 892.)

On November 21, 2008, Mark Loftis, M.A., performed a consultative psychological evaluation. (Tr. 872-76.) The plaintiff reported that her depression was an 8 or 8.5 on a 10 point scale. (Tr. 875.) Mr. Loftis opined that the plaintiff had mild to moderate impairment in her ability to understand and recall instructions; mild impairment in her ability to perform simple, repetitive tasks; mild to moderate impairment in concentration skills, persistence, and ability to maintain a competitive pace; moderate impairment in social interaction skills necessary to deal with coworkers and supervisors; and moderate limitations in her ability to adapt to changes. (Tr. 875-76.) Mr. Loftis reported that the plaintiff presented no evidence of malingering and that her thought content and process were logical and coherent. (Tr. 874.) He diagnosed her with anxiety disorder, bipolar disorder, and borderline personality disorder (by history). (Tr. 874-75.) In a Medical Source Statement dated November 22, 2008, Mr. Loftis opined that the plaintiff would have mild to

moderate difficulty understanding, remembering, and carrying out simple instructions and making judgments on simple work-related decisions. (Tr. 869.) Further, Mr. Loftis opined that the plaintiff would have moderate difficulty with understanding, remembering, and carrying out complex instructions; making judgments on complex work-related decisions; interacting appropriately with the public, supervisors, and co-workers; and responding appropriately to usual work situations and changes in a routine work setting. (Tr. 869-70.)

### 3. Plaintiff's Interrogatories

The plaintiff answered a set of interrogatories on January 5, 2009. (Tr. 817-26.) The plaintiff indicated that she is unable to work because of severe anxiety and depression and pain in her neck, arms, and hands. (Tr. 818.) She stated that she gets "stressed very quickly" and "cannot handle things" like she used to and that she has difficulty interacting with people, sleeping, and keeping her mind on task. *Id*. She said that her neck pain extends to her shoulder blades and arms, that her hands go numb and she drops things, and that she has trouble lifting a gallon of milk. *Id*.

The plaintiff indicated that she has headaches and pain in her neck, back, knees, shoulders, and hands. (Tr. 818-19.) According to the plaintiff, three or four times per month her headaches are so bad that she must lie down in a dark place for between four and eighteen hours and that once or twice per month her headaches cause vomiting. (Tr. 819.) The plaintiff reported that she has daily neck pain that becomes "severe" 3-4 times per week. *Id*. She described her neck pain as ranging from 4-9 on a ten point pain scale, and on 3-4 days per week, the pain is 8-9 on the pain scale. *Id*. The plaintiff also reported that she has back pain daily, with severe pain two weeks out of the month.

*Id.* She rated her daily back pain as a four on the pain scale, and described it as a dull throbbing pain. *Id.* The plaintiff rated her severe back pain as 6-7 on the pain scale. *Id.* She described her hand pain as "constant since 2004." *Id.* She explained that her hands feel tingly and numb, constantly ache, and cause her to drop things and that her hand pain makes writing difficult. *Id.* Additionally, she reported having constant right knee pain since 2004. (Tr. 820.) She stated that there is a sharp pain when her knee locks up and that at times it "feels like there is something in my knee about half as big as my fist." *Id.*

At the time the plaintiff completed the interrogatories, she was taking Ezol, Vicoprofen, Robaxin, Xanax, and Lamictal. (Tr. 820.) The plaintiff did not believe that Robaxin or Vicoprofen were effective. *Id.*

She estimated that she could walk for thirty minutes and stand for about 15-20 minutes before she needs to sit or lie down. (Tr. 821-22.) She stated that, in an eight hour day, she can stand for one hour, walk for one and a half hours, and sit for three hours. (Tr. 822.) She reported that she lies down about two times per day from thirty minutes to one hour at a time. *Id.* She estimated that she can pick up 2-3 pounds with her right hand, five pounds with her left hand, and 6-8 pounds with both hands. *Id.*

The plaintiff reported that she typically washes dishes, picks up and separates dirty clothes, sweeps, and occasionally cooks. (Tr. 824.) She relayed that sometimes brushing or washing her hair can be painful and that she cut her hair short to make these tasks easier. The plaintiff wakes up at about 5:00 a.m., prepares breakfast for her son and daughter, brushes her daughter's hair, lays out her children's clothes, and keeps her children company while they eat breakfast. *Id.* The plaintiff's

ex-husband, who lives with her, performs the rest of the household chores. (Tr. 825.) The plaintiff also reported that she sometimes helps her daughter with homework but that usually her ex-husband or another relative helps. *Id*. The plaintiff stated that her ex-husband helps their son with homework because it has become too difficult and "irritating" for the plaintiff to do so. *Id*.

The plaintiff drives once per week to the grocery store. (Tr. 822.) She sometimes exercises to relieve pain in her back, but she reported that exercise increases the pain in her neck. (Tr. 824.) She reported watching 4-5 hours of television per day while sitting on a recliner or couch and stated that she sometimes replays the same movie because she has difficulty focusing. *Id*. She rarely attends church, but occasionally attends family cookouts or reunions. (Tr. 823.)

**B. Hearing Testimony**

At the hearing on January 27, 2009, the plaintiff was represented by counsel, and the plaintiff and JoAnn Bullard, a vocational expert ("VE"), testified. (Tr. 937-59.) The plaintiff testified that she completed the eighth grade and previously worked as a sewing machine operator, assembly worker, and garment inspector. (Tr. 943.) She is divorced and lives with her ex-husband and two children. *Id.*

The plaintiff testified that she underwent three neck surgeries between 2001 and 2003 and that her pain did not improve after these surgeries. (Tr. 944.) She explained that she has a limited range of motion in her neck and is only able to move her head an inch or two in any direction. (Tr. 944-45.) The plaintiff also recounted having problems with her grip strength in both hands.

(Tr. 945-46.) She relayed having carpal tunnel surgery on her right wrist and noted that she has difficulty with both hands when she tries to lift, grip, or write for more than 5-10 minutes. (Tr. 945.)

The plaintiff testified that she has a history of depression and problems with anger management. (Tr. 947.) She explained that when she divorced her husband six years ago, she gave him custody of the children because she did not feel capable of caring for them at that time because of her "anger problems, depression . . . [and] nerve problems." (Tr. 948.) After a two year separation she is again living with her ex-husband and two children. *Id*. The plaintiff sometimes helps care for the children, but testified that often her ex-husband and his mother assist her. (Tr. 948-49.) The plaintiff testified that she has been able to keep her anger under control by removing herself from situations and that she has never been verbally or physically abusive to her children. (Tr. 949.) The plaintiff testified that she cut herself several times as a way of "acting out," but currently has no suicidal plans. (Tr. 950-51.)

According to the plaintiff, her ex-husband or relatives assist with household chores, she does not go grocery shopping alone anymore, and she typically shops with her ex-husband so that he can place heavy items in the shopping cart. (Tr. 951-52.) She tends to shop at smaller grocery stores because she dislikes crowds. (Tr. 952.) She also testified that her dislike of crowds prevents her from attending some of her children's school activities. (Tr. 949.)

The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") (tr. 955-56), and classified the plaintiff's past jobs of sewing machine operator and garment inspector as light and semi-skilled and as an assembly worker as light and unskilled. (Tr. 953.) The ALJ asked the VE to consider a hypothetical person with the plaintiff's age, limited

15

education, and past work experience who was "precluded from any more than occasional climbing of stairs and ramps, or bending from the waist to the floor. Precluded from any climbing of ladders, ropes and scaffolds; stooping, crouching, crawling; from any overhead reaching, or from any work around hazards such as dangerous and moving machinery, [or] unprotected heights" and who was also limited to "no more than simple repetitive non-detailed tasks" and required "casual and infrequent" coworker contact and "minimal to non-existent" public contact. (Tr. 954.)

The ALJ asked whether such a person would be able to obtain any light or sedentary level work in the regional or national economy. (Tr. 954-55.) The VE responded that the plaintiff could perform light, unskilled work as a marker, laundry folder, or textile checker; or sedentary work as a table worker, hand bander, or surveillance system operator monitor. (Tr. 955.)

Finally, the VE testified that a hypothetical person who also suffered from mild to moderate pain would be able to perform each of these jobs; however, a person with severe pain would be precluded from all work. (Tr. 956.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on July 17, 2009. (Tr. 16-27.) Based upon the record the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2003.

2. The claimant has not engaged in substantial gainful activity since May 18, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.	The claimant has the following severe impairments: status post three cervical spine surgeries; status post two right knee surgeries; status post right carpal tunnel release surgery; bipolar disorder; anxiety disorder; borderline personality disorder (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

\*\*\*

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual function capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to no more than occasional climbing of stairs or ropes; no more than occasional bending from the waist to the floor; precluded from any climbing of ladders, ropes or scaffolds; precluded from any stooping, crouching or crawling; and precluded from any overhead reaching or work around hazzards such as dangerous moving machinery or unprotected heights. In addition, the claimant is limited to performing simple, repetitive non-detailed tasks where co-worker and public contact is casual and infrequent, where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced.

\*\*\*

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416. 965).

\*\*\*

7.	The claimant was born on February 19, 1970 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

***

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 18, 2001 through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-27.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social

Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c),

404.1513(d).   First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.*  (citing 20 C.F.R.  §§ 404.1520(b), 416.920(b)); *Cruse v.  Comm'r of Soc.  Sec.*, 502 F.3d 532, 539 (6th Cir.  2007).   A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be.  *See, e.g., Dinkel v.  Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir.  1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement.  20 C.F.R.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  *See also Edwards v.  Comm'r of Soc.  Sec.*, 113 Fed.  Appx.  83, 85 (6th Cir.  2004).   A "severe impairment" is one which "significantly limits .  .  .  physical or mental ability to do basic work activities." *Barnhart v.  Thomas*, 540 U.S.  20, 24, 124 S.  Ct.  376, 157 L.  Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).   Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment.   42 U.S.C. § 423(d)(2)(B); *Foster v.  Bowen*, 853 F.2d 483, 490 (6th Cir.  1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience.   20 C.F.R.  §§ 404.1520(d),

416.920(d)).  The plaintiff may establish that she meets or equals a listed impairment, and that the

impairment has lasted or is expected to last for at least twelve months or result in death.  *See*

*Listenbee v.  Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir.  1988).  The plaintiff is

not required to show the existence of a listed impairment in order to be found disabled, but such a

showing results in an automatic finding of disability.  *See Blankenship v.  Bowen*, 874 F.2d 1116,

1122 (6th Cir.  1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work,

she is not disabled.  *Id.*  The plaintiff has the burden of proving inability to perform past relevant

work or proving that a particular past job should not be considered relevant.  *Cruse*, 502 F.3d at 539;

*Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence

and severity of limitations caused by [her] impairments and the fact that [she] is precluded from

performing [her] past relevant work"); *Smith v.  Sec'y of Health & Human Servs.*, 893 F.2d 106, 109

(6th Cir.  1989).  If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior

relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff

can perform other substantial gainful employment and that such employment exists in significant

numbers in the national economy.  *Longworth v.  Comm'r of Soc.  Sec.*, 402 F.3d 591, 595 (6th Cir.

2005) (quoting *Walters v.  Comm'r of Soc.  Sec.*, 127 F.3d 525, 529 (6th Cir.  1997)).  *See also*

*Felisky v.  Bowen*, 35 F.3d 1027, 1035 (6th Cir.  1994).  To rebut a *prima facie* case, the

Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform.

*Longworth*, 402 F.3d at 595.  *See also Kirk v.  Sec'y of Health & Human Servs.*, 667 F.2d 524, 528

(6th Cir.  1981), *cert.  denied*, 461 U.S.  957, 103 S.  Ct.  2428, 77 L.  Ed.  2d 1315 (1983)

(upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances).  It remains the plaintiff's burden to prove the extent of her functional limitations.  *Her*, 203 F.3d at 391.  Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled.  *Rabbers v.  Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir.  2009)*.  See also Tyra v.  Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir.  1990); *Farris v.  Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir.  1985); *Mowery v.  Heckler*, 771 F.2d 966, 969-70 (6th Cir.  1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further.  20 C.F.R.  § 404.1520(a)(4).  *See also Higgs v.  Bowen*, 880 F.2d 860, 863 (6th Cir.  1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process.  At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Tr.  18.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "status post three cervical spine surgeries; status post two right knee surgeries; status post right carpal tunnel release surgery; bipolar disorder; anxiety disorder; [and] borderline personality disorder." *Id*.  At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19.) At step four, the ALJ determined that the plaintiff was not capable of performing her past relevant work as a sewing machine operator, assembly worker, or garment inspector. (Tr. 25-26.) At step five, the ALJ determined that the plaintiff could work as a marker, laundry folder, textile checker, table worker, hand bander, and system monitor. (Tr. 26-27.)

## C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred by failing to find her disabled under Listing 1.04A. Docket Entry No. 16, at 14-16. The plaintiff also contends that the ALJ did not properly assess her credibility and assertions of disabling pain. *Id*. at 16-18. Finally, the plaintiff argues that the ALJ did not properly evaluate her psychological restrictions. *Id*. at 18-19.[17]

### 1. The ALJ Properly Found that the Plaintiff Neither Met Nor Medically Equaled Listing 1.04A.

At step three, the burden of proof lies with the plaintiff to prove that her impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Her v. Comm'r of Soc.*

---

[17] Inexplicably, the defendant provides counterarguments for a fourth and fifth issue even though the plaintiff only raised three issues. Docket Entry No. 20, at 17-19. The defendant's counterargument on the "fourth" issue (i.e., the ALJ's reliance on VE testimony), *id.* at 17-18, addresses an issue not raised by the plaintiff. Indeed, it appears that the defendant is addressing an entirely different case because she cites to facts not in the record and pages of the plaintiff's brief that do not exist. Likewise, the defendant's counterargument on the "fifth" issue (i.e., the ALJ's assessment of the plaintiff's credibility), *id*. at 18-19, duplicate the defendant's counterargument on the second issue, *id.* at 10-13, except that it also incorrectly cites to the record and appears to address a different case altogether.

*Sec*, 203 F.3d 388, 391 (6th Cir. 1999); *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed.2d 967 (1990). *See also Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). If the plaintiff's impairment does not meet the criteria of a listing, she can present evidence that her impairment is medically equivalent to a listing. *Bailey v. Comm'r of Soc. Sec.*, 413 Fed. Appx. 853, 854 (6th Cir. 2011); 20 C.F.R. §§ 404.1525(c)(5); 404.1526. For the plaintiff to establish medical equivalence, she "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531 (emphasis in original). If the plaintiff demonstrates that her impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

The plaintiff asserts that she is entitled to a finding of disability under Listing 1.04A, which has the following criteria:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A. Thus, in order for the plaintiff to be found disabled under Listing 1.04A, she must demonstrate that she has: "(1) a spinal disorder that (2) result[ed] in 'compromise of a nerve root' with (3) 'neuro-anatomic distribution of pain,' (4) 'limitation of motion of the spine,' and (5) motor loss (muscle weakness) accompanied by (6) sensory or reflex loss."[18] *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 375474 (S.D. Ohio Jan. 29, 2013) (adopting Report and Recommendation, 2013 WL 80185, at *3 (S.D. Ohio Jan. 7, 2013)).

Here, the plaintiff has not shown that she meets or equals Listing 1.04A. Although the plaintiff has, at times, met some of the criteria of the listing, the record does not indicate that she ever satisfied all of its criteria.

In May 2001, the plaintiff was diagnosed with a small herniated disc at C5-6 (tr. 353, 684, 708), and, in June 2001, she underwent a right C5-6 hemilaminectomy, partial medial facetectomy, and diskectomy to remove the herniated disc and relieve nerve compression. (Tr. 358, 683, 713-14.) Following surgery, the plaintiff continued to complain of neck pain and numbness in her right arm. (Tr. 681-83.) In October 2001, a cervical MRI revealed disc herniation and osteophyte formation (tr. 357, 707), and Dr. Jestus performed a second surgery, which involved an anterior cervical diskectomy and fusion at C5-6. (Tr. 711-12.)

The plaintiff continued to experience neck and arm pain, and, although the C5-6 fusion initially appeared satisfactory, the vertebra failed to fuse properly. (Tr. 671-80.) In February 2003, the plaintiff complained of bilateral hand tingling, but Dr. Jestus believed these symptoms were

---

[18] There is no "involvement of the lower back" in this case because the plaintiff has only experienced cervical pain and only had surgery on her upper spine.

indicative of carpal tunnel syndrome rather than radiculopathy[19]. (Tr. 671.) Dr. Jestus offered to give the plaintiff an electromyography ("EMG") exam to confirm the source of her symptoms, but she declined. *Id.* An MRI of the plaintiff's cervical spine on July 1, 2003, revealed a "normal appearance of the cervical spinal cord" and "no focal disc protrusion or central stenosis." (Tr. 387.) However, after the plaintiff's vertebral fusion went to a fibrous, not bony, union, she underwent a third surgery on July 14, 2003, to "redo" foraminotomy on the right C5-6 cervical fusion. (Tr. 667-69, 709-10.)

The plaintiff continued to complain of neck pain after her third surgery. (Tr. 585, 588, 591, 595, 597, 664-66.) However, CT scans taken after the surgery revealed a normal cervical spine. (Tr. 401, 404-05, 407.) An MRI on July 21, 2004, revealed "no gross evidence of disc herniation or spinal stenosis." (Tr. 591.) Nurse practitioner Boles, whom the plaintiff frequently visited with complaints of neck pain, noted that the plaintiff demonstrated limited range of motion in her neck (tr. 501, 505, 507, 597) and diagnosed radiculopathy. (Tr. 482, 484, 491, 493, 495, 590.) When Dr. Surber examined the plaintiff in September 2004, he found that the plaintiff had limited range of motion in her neck but equal and full bilateral grip strength as well as full muscle strength in both upper and lower limbs. (Tr. 632-33.)

Based on the plaintiff's complaints of neck pain, Mr. Boles referred the plaintiff to Dr. Jestus in December 2005; however, Dr. Jestus found no "objective evidence of pathology in her on exam or by imaging." (Tr. 193.) A myelogram was negative (tr. 190-91, 419), and a CT scan and MRI of the plaintiff's cervical spine were both unremarkable. (Tr. 191-92, 418, 474.) Dr. Jestus reported

---

[19] The plaintiff eventually had carpal tunnel release surgery in 2005. (Tr. 472-73.)

that the plaintiff "does not have recurrent disc herniation, nor does she had [*sic*] pseudoarthrosis, nor does she have a disc herniation at either the levels above or below the fusion" and indicated that he believed the source of the plaintiff's pain was arthritis. (Tr. 190-91.) The plaintiff's motor exam was normal in the bilateral upper and lower extremities and her muscle tone in those areas was "normal without atrophy or abnormal movements." (Tr. 192.)

The medical evidence shows that, although the plaintiff previously had a herniated disc as well as some associated nerve compression, this condition was corrected through surgery. Unfortunately, the plaintiff had to undergo three surgeries to remove the herniated disk at C5-6 and achieve successful fusion of the vertebra. However, Dr. Jestus's records provide overwhelming, objective evidence that by the time the plaintiff's third surgery was completed in 2003, she did not have an underlying spinal disorder resulting in compromise of a nerve root. Likewise, the plaintiff has not demonstrated neuro-anatomic distribution of pain. Although the plaintiff complained of radicular symptoms and nurse practitioner Boles diagnosed radiculopathy, objective testing done by Dr. Jestus specifically refuted that the plaintiff had radiculopathy. There is simply nothing in the record beyond the plaintiff's subjective complaints[20] and Mr. Boles's diagnosis to suggest neuro-anatomic distribution of pain. A "mere diagnosis . . . says nothing about the severity of the condition," and cannot be solely relied upon when determining whether a plaintiff's physical impairments meet a listing. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). This evidence is not sufficient to overcome Dr. Jestus's opinion based on objective testing that the plaintiff's symptoms were not indicative of radiculopathy. Finally, the plaintiff has not demonstrated motor

---

[20] The plaintiff's subjective complaints of pain are discussed below.

loss accompanied by sensory or reflex loss. Dr. Jestus and Dr. Surber both examined the plaintiff and determined that she exhibited no deficits in bilateral upper and lower muscle strength, grip strength, or muscle tone and no evidence of atrophy or abnormal movements. (Tr. 192, 632-33.)

The plaintiff has demonstrated some limitation of motion and pain in her neck. However, these limitations standing alone are insufficient to meet or equal Listing 1.04A. She has failed in several regards to satisfy the necessary criteria to be considered automatically disabled under Listing 1.04A. Consequently, the Court concludes that the ALJ did not err in finding that the plaintiff failed to meet or equal the listing.

## 2. The ALJ Properly Addressed the Plaintiff's Credibility.

The plaintiff contends that the ALJ erred in evaluating the credibility of her subjective complaints of pain. Docket Entry No. 16, at 16-18. The defendant counters that the ALJ correctly determined that the objective medical evidence did not support the plaintiff's allegations of disabling pain. Docket Entry No. 20, at 10-13.

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 346 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). If the ALJ rejects the plaintiff's complaints, however, he must clearly articulate his reason for this finding. *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954,

958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. July 7, 1994)).

Moreover, Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. An "ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other." *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have provided guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims[21]. The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from

---

[21] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id*. This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[22]

The ALJ satisfied the first prong of the *Duncan* test when he found that the plaintiff had a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. (Tr. 21.) However, the ALJ found that the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC finding. *Id*. Contrary to the plaintiff's allegation that the ALJ did

---

[22] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms.

not properly address her credibility, the ALJ in fact discussed the plaintiff's credibility in significant detail. (Tr. 21-25.)

The ALJ relied upon the plaintiff's medical records and testimony in making his credibility finding. The ALJ addressed, *inter alia*, the plaintiff's surgical and non-surgical treatment history; the location and nature of her pain; the fact that her pain was generally controlled with prescribed medications; her daily activities; and her modest physical examination findings. (Tr. 21-25.) Perhaps most importantly, the ALJ noted specific instances in which the plaintiff attempted to exaggerate her symptoms, was noncompliant with prescribed medication, or was suspected by her medical care providers of drug seeking behavior. *Id.* The ALJ's findings in this regard are well supported by the record. (Tr. 272, 471, 633, 638, 668, 673, 725, 734-35, 821, 929.)

The Court concludes that the ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations of disability were not fully credible. The ALJ's decision indicates that he complied with the *Duncan* test and 20 C.F.R. § 404.1529(c) in evaluating the plaintiff's credibility regarding her subjective complaints of pain.

### 3. The ALJ Properly Addressed the Plaintiff's Mental Limitations.

Finally, the plaintiff argues that the ALJ did not properly address her mental impairments. Docket Entry No. 16, at 18-19. Specifically, the plaintiff contends that the ALJ erred in only giving "some" weight to Dr. Blazina's opinion. Docket Entry No. 16, at 18.

According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the

Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[23] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2)[24]. *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

---

[23] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

[24] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 416.927(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification[25]. *Wilson*, 378 F.3d at 544-45.

The plaintiff's argument appears to center on the ALJ's decision to only adopt some of Dr. Blazina's recommended limitations and reject others. Dr. Blazina, a DDS consultative

---

[25] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

psychologist, examined the plaintiff on October 8, 2005, and authored a written report[26]. (Tr. 551-55.) Dr. Blazina opined that the plaintiff's ability to understand and remember was not significantly limited; that her ability to sustain concentration and persistence was mildly to moderately limited; and that her ability to adapt to changes in a work routine and tolerate workplace stress was moderately limited. (Tr. 555.) The ALJ found that these limitations were supported by the record and incorporated them into the plaintiff's RFC. (Tr. 24.) Dr. Blazina also opined that the plaintiff's ability to interact socially was "moderately to severely impaired due to her characterological issues, as well as depression and chronic pain issues." (Tr. 555.) The ALJ, however, concluded that this limitation was "inconsistent with the overall evidence of record, which indicates that the claimant is able to interact with others adequately on at least a superficial level." (Tr. 24-25.)

Initially, the Court notes that Dr. Blazina is not a treating source because she only examined the plaintiff on one occasion. (Tr. 551-55.) *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). However, even though Dr. Blazina is not an acceptable treating source, and thus the treating physician rule does not apply to her, the ALJ must still consider her medical findings. *See* 20 C.F.R.

---

[26] The plaintiff asserts that "the transcript is missing part of Dr. Blazina's report." Docket Entry No. 16, at 7. However, although one copy of Dr. Blazina's report appears to have been truncated in the record (tr. 556-60), a second, completed copy of Dr. Blazina's report is also in the record. (Tr. 551-55.)

§ 404.1527(c).  Dr.  Blazina is a nontreating source, and the Regulations require the ALJ to evaluate her medical findings in light of the factors in  20 C.F.R.  §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

The ALJ did not discount Dr.  Blazina's examination in its totality; rather, he only gave weight to the portions of her opinion that were consistent with other objective medical evidence in the record.  (Tr.  24-25.) The ALJ concluded that Dr.  Blazina's opinion that the plaintiff's social interaction abilities were moderately to severely impaired was not supported by the evidence of record.  *Id*.  The ALJ gave greater weight to the November 2008 consultative psychological examination report completed by Mr.  Loftis, in which he opined that the plaintiff had only moderate impairments in social interaction skills necessary to deal with coworkers and supervisors.  (Tr.  25, 876.) The ALJ also noted that on a CRG assessment completed by PMHC staff in June 2005, the plaintiff had no more than moderate limitations in mental functioning, including only moderate limitations in interpersonal functioning.  (Tr.  24, 878-80.) Similarly, on a mental RFC assessment completed in 2005, Dr.  Hansmann assessed the plaintiff with only moderate limitations in social interaction, explaining that the plaintiff "will have some difficulty interacting effectively with the public, co-workers, and supervisors, but can do so." (Tr.  548-49.) Thus, the record supports the ALJ's conclusion that Dr.  Blazina's opinion was overly restrictive regarding the plaintiff's ability to interact socially.

The ALJ comprehensively addressed Dr.  Blazina's opinion, and to the extent that the ALJ rejected part of her opinion, the ALJ adequately explained his rationale.  Further, the reasons that the ALJ gave are supported by substantial evidence in the record.  The Court concludes that the ALJ did not err in assessing the plaintiff's mental impairments.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 15) be DENIED and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge